1
2
3
4
5

6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| **RICHARD PHILLIPS, in his capacity as the administrator of the ESTATE OF TROY PHILLIPS,; TIFFANY PHILLIPS,** | **1:13-cv-0538  AWI BAM** |
| **Plaintiffs,** | **MEMORANDUM ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE SUMMARY ADJUDICATION** |
| **vs.** | |
| **COUNTY OF FRESNO; MARGARET MIMS; TOM GATTIE; RICK HILL; CORRECTIONAL OFFICER  C. DIAZ; JACK ROCHA, individually and in their official capacities as correctional and classification officers of the Fresno County Sheriff's Department,** | **Doc. # 104** |
| **Defendants.** | |

21          In this action for damages, defendants County of Fresno, et al. ("Defendants") have

22   moved for summary judgment or summary adjudication as to all claims alleged by plaintiffs

23   Richard Phillips as administrator of the estate of Troy Phillips ("Decedent") and Tiffany Phillips

24   (collectively, "Plaintiffs") in their Second Amended Complaint ("SAC").  This action for civil

25   rights violation and wrongful death arises out of the co-housing of Decedent, a pretrial detainee,

26   with Jose Cuevas ("Cuevas") who attacked Decedent on February 14, 2012, ultimately causing

27   his death.  Plaintiffs' SAC alleges five claims for relief.  Plaintiff's first claim alleges violation

28   of 42 U.S.C. § 1983 based on failure to protect in violation of the Due Process Clause of the

Fourteenth Amendment.  Plaintiff's second and third claims for relief allege supervisory and entity liability for "customs, practices and policies" giving rise to Plaintiffs' claims (second claim for relief) and for failure to adequately train, supervise and select (third claim for relief). Plaintiffs' fourth claim for relief alleges wrongful death pursuant to California common law.

Plaintiff's fifth claim for relief alleges breach of mandatory duty in violation of California Government Code section 845.6.  Docket Number 99 stipulates that "[a]ll claims relating to jail staff's response to the subject incident are hereby dismissed from this action." Based on the content of Defendants' motion for summary judgment and Plaintiffs' opposition, the court will proceed on the assumption that the parties have stipulated that *all* claims arising out of, or in connection with, any alleged delay in provision of medical response to Decedent, including any claims relating to staffing or training and supervision of personnel connected with any response to Decedent's injuries, have been *dismissed* by stipulation.  Based on this presumption, the court finds that Plaintiffs' fifth claim for relief has been abandoned. [1]

**PROCEDURAL HISTORY**

The procedural history of this case was most recently recounted in the court's order of July 30, 2015, denying Defendants' motion to dismiss.  Doc. # 94.  That narrative of the procedural history of this case is incorporated here by reference.  Briefly, the complaint in this action was filed on April 15, 2013.  On April 15, 2015, the court granted Plaintiffs' motion to file the currently-operative SAC and granted Plaintiffs' motion to substitute defendant Diaz for one of the Doe defendants.  Plaintiff's SAC was filed in April 22, 2015.  Defendants' motion to

---

[1]   The court also notes there have been recent stipulations substantially modifying the named defendant parties in Plaintiffs' SAC.  At Docket Number 103, the parties stipulated to the dismissal of named Defendants Edward Moreno, George Laird and Pratap Narayan in their individual and official capacities. At Docket Number 99, the parties stipulated to the dismissal of individual Defendants Correctional Officer Her, Correctional Officer Yang and Correctional Officer Castro.  New Defendant Jack Rocha is substituted in as a Doe Defendant.  Because of these dismissals and substitutions, the court has altered the caption to reflect what it understands to be the current makeup of the parties to this case.  If the court is incorrect in any of its presumptions regarding either the Defendant parties or issues active in this case, it shall be up to the parties to submit a stipulated statement of correction.

dismiss the SAC was denied in its entirety on July 30, 2015.  As noted in footnote 1, stipulations by the parties resulted in the dismissal of medical service personnel Moreno, Laird and Narayan and correctional officers Her, Yang, and Castro.  Defendants filed their answer to Plaintiffs' SAC on January 14, 2016, and filed the instant motion for summary judgment on March 25, 2016.  Plaintiffs' opposition was filed on May 2, 2016, and Defendant's reply was filed on May 20, 2016.

## FACTUAL BACKGROUND

This action arises out of the death of Decedent Troy Phillips following an attack by inmate Jose Cuevas ("Cuevas") during a period of time that Decedent was a pretrial detainee in the custody of Fresno County Jail.  Plaintiffs contend that Defendants failed to protect Decedent from being attacked by Cuevas in violation of his rights under the Fourteenth Amendment (Claim 1), and that Defendants failed to properly select, train, discipline and supervise employees responsible for Decedent's safety and that the County of Fresno directly caused the events complained of by failing to provide adequate policies, facilities and services for the care of detainees having psychiatric problems (Claims 2 and 3).  Plaintiffs' SAC also alleges a claim for wrongful death under California common law against all Defendants.  Defendants have proffered a total of 158 undisputed material facts ("UMF's").  Some of these pertain to Plaintiffs' claims against the individual Defendants who are alleged to have co-housed Decedent and Cuevas in disregard of information that was, or should have been, known to them indicating the unreasonable danger posed by Cuevas to Decedent.  Other UMF's pertain to the County of Fresno and individual Defendants who had policy making, personnel training or supervisory roles that directly led to Decedent's harm.  Because of the large number of UMF's alleged and because of the extensive opposition by Plaintiffs to many of these UMF's, the court will summarize both Defendants' UMF's and Plaintiffs' objections during the relevant portions of the analysis that follows.

//

//

Certain of Defendants' UMF's have been extensively disputed by Plaintiffs who have presented deposition and declaration evidence in support of their own Disputed Material Facts (DMF's). The court notes that Defendants have objected to a large number of Plaintiffs' DMF's on the basis of lack of foundation, hearsay or other procedural grounds.  Plaintiffs correctly point out that the court routinely disregards evidentiary objections that could be cured at trial by authentication, testimony of a proper witness or an adequate showing of a witness's qualifications as an expert.  All objections on such grounds will be disregarded for purposes of the discussion that follows and all motions to exclude evidence on these grounds are hereby denied without prejudice.

## LEGAL STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Although the party moving for summary judgment always has the initial responsibility of informing the court of the basis for its motion, the nature of the responsibility varies "depending on whether the legal issues are ones on which the movant or the non-movant would bear the burden of proof at trial."  Cecala v. Newman, 532 F.Supp.2d 1118, 1132-1133 (D. Ariz. 2007).  A party that does not have the ultimate burden of persuasion at trial – usually but not always the defendant – "has both the initial burden of production and the ultimate burden of persuasion on the motion for summary judgment."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  "In

order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

-5-

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## DISCUSSION

### I.  Plaintiffs' Claims Pursuant to 42 U.S.C. § 1983

#### A.  *Standard for Determination of Fourteenth Amendment Violation*

The court has previously noted that among the rights that inure to the person in custody is a right to be protected from the violent acts of other inmates.  See Farmer v. Brennan, 511 U.S. 825, 833 (1994) ("prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners").  With regard to the standard for determination of a violation of the right to protection under the Fourteenth Amendment, the court has previously explained that:

> In the context of the person in custody in a jail or prison, the conduct of officials that gives rise to liability under 42 U.S.C. § 1983 is conduct amounting to "deliberate indifference." Redman v. City of San Diego, 942 F.2d 1435, 1441 (9th Cir. 1991). While the discussion in Redman makes it clear that the meaning of "deliberate indifference" varies depending on the context in which the alleged violation occurs, the standard applies to all allegations of constitutional violation within the jail or prison context. The decision in Redman is particularly instructive with regard to Plaintiffs'' claim for failure to protect because, like the case at bar, it dealt with the decision of jail officials to house a pretrial detainee in a cell occupied by an individual known to be sexually and physically assaultive. Id. at 1437-1438. The Redman court noted that the definition of "deliberate indifference" set forth in Berg v. Kinchloe, 942 F.2d 457, 459 (9th Cir. 1986) is applicable in situations such as this where an in-custody detainee

alleges violation of the Fourteenth Amendment Due Process rights.  The Redman court quoted Berg as follows:

> The "deliberate indifference" standard requires a finding of some degree of "individual culpability," but does not require an express intent to punish. The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, we must have more than a mere suspicion that an attack will occur.

Redman, 942 F.2d at 1442 (quoting Berg, 794 F.2d at 459).

Doc. # 34 at 10:6-23.

In Clouthier v. Countra Costa, 591 F.3d 1232 (9th Cir. 2010), the Ninth Circuit addressed the proper legal standard for determination of liability in a Fourteenth Amendment  failure-to-protect claim by the survivors of a mentally troubled pretrial detainee who committed suicide. Pertinent to the motion before the court, the Clouthier court made a clear distinction between a detainee incarcerated to assure his/her appearance at a trial or legal proceeding related to a trial and a detainee incarcerated pending court-ordered psychiatric treatment or evaluation.  With regard to the latter, the Clouthier court recognized that, under Youngberg v. Romo, 457 U.S. 307 (1982), detainees awaiting court-ordered psychiatric evaluation and/or treatment are entitled to care that "does not substantially depart from accepted professional judgment, practice or standards."  Clouthier, 591 F.3d at 1243.  The Fourteenth Amendment rights of such individuals are therefore subject to an "objective" standard.  Id.  With regard to persons detained for the purpose of assuring their presence for trial or legal proceedings, however, the Clouthier court held that the rights of the detainee are determined according "the deliberate indifference standard articulated in Farmer and applied by our cases in the context of pretrial detainees."  Id. at 1244.

While the legal standard for the imposition of liability for violation of Fourteenth Amendment rights has always been contextually dependent and never "well settled," the matter has become somewhat less settled following the Supreme Court's decision in Kingsley v.

Hendrickson, --- U.S. ---; 135 S.Ct. 2466 (2015).  In Kingsley, the Supreme Court addressed the question of what state of mind must be found to hold a prison official liable for *excessive force* against a pretrial detainee under the *Fourteenth* Amendment.  The Kingsley Court held that the standard is an *objective* one – that the detainee need show "that the force purposely or knowingly used against him was objectively unreasonable.  Id. at 2473.  The Supreme Court issued its decision in  Kingsley on June 22, 2015.  Immediately thereafter, the Ninth Circuit gave consideration to the argument that the standard established in Kingsley should displace the standard established in Redman and Clothier for purposes of determining the Fourteenth Amendment claims of pretrial detainees who allege claims arising from a failure to protect.  See Castro v. County of Los Angeles, 797 F.3d 654 (9th Cir. 2015).  A divided three judge panel of the Ninth Circuit declined to change the standard established in Clothier and held that claims for failure to protect are "substantively different" from the excessive force claim alleged in Kingsley even though both are rooted in the Fourteenth Amendment.  Id.

While the decision in Castro would have settled the matter for purposes of the instant motion, the decision was withdrawn and the matter was set for rehearing *en banc* on December 28, 2015.  The question of the current status of Fourteenth Amendment jurisprudence regarding detainee rights was painstakingly reviewed by the Central District Court in Hatter v. Dyer, --- F.Supp.3d --- (C.D. Cal. 2015); a decision that was signed on December 31, 2015.  The Central District concluded first that Redman is currently the authoritative case for purposes of failure to protect claims.  Id. at *9.  In addition, the Hatter court concluded that there is "significant tension" between Redman (and Castro) and Kingsley.  Id. at *9-*10.  Although the question before the Hatter was one of conditions of confinement, it is this court's opinion that the Central District's conclusions regarding governing Fourteenth Amendment precedent in this circuit are equally applicable to the failure to protect claims now before this court.

1
2
3
4
5
6
7
8

        The <u>Hatter</u> court concluded that the standard expressed by <u>Redman</u> is authoritative

notwithstanding the "significant tension" between <u>Redman</u> and <u>Kingsley</u> based on the fact that

the decision in <u>Castro</u> held that the "tension" between it and <u>Kingsley</u> is not irreconcilable.

Thus, the <u>Hatter</u> Court recognized that, while the holding in <u>Castro</u> is currently uncertain, the

factual differences between <u>Redman</u> and <u>Kingsley</u> mean that the standard set by <u>Redman</u>

remains in effect in the context of conditions of confinement cases until and unless the *en banc*

hearing in <u>Castro</u> produces a result that overturns <u>Redmond</u>.

9
10
11
12
13
14
15
16
17
18
19
20
21

        In the case at bar, Plaintiffs' opposition to Defendants Motion for summary judgment

vigorously argues that this court should recognize the tension between <u>Redman</u> and <u>Kingsley</u>,

should disregard <u>Castro</u> and apply the objective standard suggested by <u>Kingsley</u>.  The court will

decline Plaintiff's invitation to adopt an objective standard at this time primarily because, as will

be explained *infra*, whether the court uses a subjective or objective standard does not influence

the determination of the substantive merits of Defendants' motion for summary judgment.

Further, the court finds that the argument set forth in <u>Hatter</u> is thoroughly researched and well-

reasoned and is therefore persuasive for purposes of the motion currently before the court.  The

court recognizes that the issue of Fourteenth Amendment rights of incarcerated persons is

currently somewhat fluid and may therefore be subject to reexamination in light of new judicial

authority.

22
23
24
25
26
27
28

        The court also points out that the "objective/subjective" distinction, when applied to jury

instructions, results in less of a distinction than the foregoing legal analysis might suggest.  This

is because while liability under the Fourteenth Amendment may require demonstration of some

subjective intent, that demonstration may be the result of an objective inquiry.  See <u>Kingsley</u>,

135 S.Ct. at 2473 (subjective intent to punish may be shown by absence of rational basis for

prison official conduct).  In the context of the facts of this case, liability under the Fourteenth

Amendment cannot be avoided by the simple expedient of claiming subjective ignorance of obvious facts. "[U]nder some circumstances, the defendant's knowledge of a substantial risk of harm may be inferred by the obviousness of the risk." Id. at 1981-83. Marable v. Franklin Cty., Tex., 62 F.3d 394 (5th Cir. 1995) (citing Farmer v. Brennan, 511 U.S. 825 (1994)). In practice, the determination by a fact finder (juror) regarding the obviousness of risk will always be objective. A juror answering the question whether the evidence is so obvious that subjective knowledge of risk should be charged to the defendant is going to use a reasonable person standard regardless of how the court or the attorneys may try to shade the issue.

Based on the allegations currently before the court, the court is anticipates that Defendants will attempt to adduce evidence to show that they lacked subjective knowledge of a substantial risk of serious harm to Decedent, and will try to show that the they had no cause to suspect any risk of harm. It is correspondingly anticipated that Plaintiffs will present evidence to show the risk of harm to Decedent was obvious and will strive to show that risk of harm was so obvious that Defendants should be charged with subjective knowledge of risk. The jury will make a determination based on what they think "obvious" is. At this point the court feels confident that it will be proper to allow jurors to make their own determination of whether the risk was or was not obvious without trying to further embellish (or muddy) the definition of the word "obvious."

## II. Fourteenth Amendment Liability

Central to Plaintiffs' action is their contention that classification and housing are separate issues and that factors other than classification are important in the determination of an inmate's compatibility with other inmates. Plaintiffs' opposition paints a picture in which Defendants, after classifying a prisoner as AdSeg 20, tries to place those prisoners in group or dual occupancy cells in an effort to make a very limited number of single cells available. Plaintiffs

allege that in their effort to free up limited single cell space, Defendants ignore obvious

indications that certain inmates should not be housed with other inmates regardless of

classification.  It is Plaintiffs' contention that the ignoring of serious threats to inmate harm

occurred at the individual, supervisory and governmental levels.

### A.  Material Facts

Decedent was booked into Fresno County Jail on December 16, 2011, "on charges of

burglary, forgery, possession of forged notes, and battery with serious bodily injury."  `Doc. #

109-1 at ¶ 81.  The parties agree that Decedent was placed in a category of Administrative

Segregation ("AdSeg 20") which designates a "psych inmate" who is to be housed in a separate

part of the jail in a unit that houses inmates in 12-man units, 2-man units or single (isolation)

cells.  Id. at ¶ 68 (Plaintiffs' DMF).   The parties also agree that Decedent's classification was

established for purposes of his last incarceration in part by the classification he received in his

prior incarceration and in part by symptoms he displayed during the most recent time in custody.

That is, Decedent had previously been classified as an inmate with psychiatric issues and that

classification was material in determining the classification applied during his last incarceration.

Defendants do not dispute that on January 4, 2012, legal proceedings against Decedent were

stayed or suspended pending a determination of Decedent's mental competence to stand trial

pursuant to Penal Code section 1368.  Doc. # 106-9 at 9.

Plaintiffs dispute that the classification officer contacted the Jail Psychiatric Service

("JPS") at the time of Decedent's classification as required by policy and alleges that an

evaluation by JPS about a month after he was taken into custody revealed that Decedent

complained of not receiving prescribed medications and was "hearing voices all the time [and]

seeing things like (shadows walking in and out)."  Doc. 109-1 at ¶ 83 (Plaintiffs' DMF).  From

UMF's 85 through 103, Defendants proffer facts to show how Decedent was categorized for

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

purposes of his housing.  The facts also show that Decedent had a series of cell mates with whom he had altercations or was otherwise not compatible.  Plaintiffs' opposition to UMF's 85 through 103 is offered to show two aspects of Decedent's classification and housing.  First, Plaintiffs' opposition tends to show by means of deposition testimony that Defendants were not consistent in the application of their own procedures and policies in determining Decedent's housing and second, that to a significant extent, the housing decisions made by Defendants was driven more by the lack of single-occupancy isolation cells than by application of their own policies and procedures.  Plaintiffs also criticize Defendants' UMF's based on the tendency of Defendants to conflate the issue of proper classification with proper housing or isolation.

Defendants proffer UMF's pertaining to the classification and housing of Cuevas at UMF numbers 104 through 122. As with Decedent, Defendants' UMF's pertaining to Cuevas indicate a fairly lengthy history of altercations, fights and threats resulting in a succession of unsuccessful attempts by Defendants to find a compatible cellmate.  Plaintiffs' proffer DMF's in opposition to Defendants' UMF's regarding Cuevas that cite deposition evidence tending to show: (1) that Cuevas' behavior was a good deal more bizarre and aggressive than is suggested by Defendants' proffered UMF's including masturbation and defecation on his cell floor and on himself, Doc. # 109-1 at ¶ 108; (2) that Cuevas had been evaluated on occasions prior to being housed with Decedent and found to be  in need of isolation for his own protection and the protection of others, see Doc. # 109-1 at ¶114; and (3) that the allegation by Defendants that there had been no incidents occurring between Cuevas and other inmates after October 23, 2011, and the attack on Decedent in the following February 14 as alleged in Defendants' UMF # 121 is contradicted by evidence of a number of incidents that lack precise dates but are represented by Plaintiffs as having occurred after October 23.

The parties agree that Defendant Rocha housed Cuevas and Decedent together on

-12-

January 25, 2012.  Pursuant to the previously alleged facts, it is Defendants' contention that both Cuevas and Decedent had been properly classified prior to the move and that the move was "lateral" and therefore did not require reclassification.  Defendants' proffered UMF # 121 states that "[a]fter October 23, 2011, there were no further reports of incidents between Cuevas and any other inmate until the date of the subject incident [on] February [14], 2012.  To this Plaintiffs offer declarations from witnesses attesting to altercations that occurred during the cited time-frame that indicated Cuevas' continuing violent behavior and the ignoring of same by jail staff.  See Doc. # 109-1 at ¶ 121 (Defendants' UMF and Plaintiffs 2-page response).  It is agreed that Cuevas and Decedent were placed in the same cell on January 25, 2012.  Plaintiffs also dispute that there were no reported instances of altercation between Decedent and Cuevas prior to the February 14 incident or that Decedent expressed no misgivings regarding his placement with Cuevas.  See Doc. # 109-1 at ¶¶ 138-140.

### B. Individual Plaintiff Liability

It is the court's understanding that, as matters stand, violation of Decedent's Fourteenth Amendment rights through the direct actions of individual Defendants are alleged against Defendants Rocha and Diaz only.  Plaintiffs allege Diaz is responsible for removing Decedent from isolation housing where Officer Torres recommended that he be housed.  Plaintiffs' allege that Diaz removed Decedent from isolation in order to free up an isolation cell in conscious disregard of facts known to Diaz indicating that Decedent should remain in an isolation cell.  See Doc. 109-1 at ¶¶ 98 and 102 (disputing Defendants' UMF's alleging Diaz had found a compatible cell mate for Decedent and that Decedent had been moved to provide Decedent with least restricted housing he could handle).

The parties agree that Defendant Rocha made the decision to house Cuevas with Decedent.  Defendants allege Rocha "had no evidence that Cuevas posed a risk of physical

danger to [Decedent].  Doc. # 109-1 at ¶ 134.  Plaintiffs vigorously dispute this allegation by

listing all of the facts present in the records of Cuevas and Decedent at the time the decision was

made.  <u>See</u> Doc. # 109-1 at ¶ 129 (Plaintiffs' opposition to Defendants UMF alleging the co-

housing of Cuevas and Decedent "was a 'lateral move' which did not require reclassification of

Cuevas or [Decedent]").

      At the level of a motion for summary judgment, it is not the court's task to weigh either

the quantity or quality of evidence.  Rather, the court merely determines whether the opposing

party has submitted evidence sufficient to create an issue of material fact that must be submitted

to a trier of fact.  The court notes that both parties have submitted substantial volumes of

deposition and declaration evidence.  While the court cannot claim in honesty to have read every

word of every submission, it has made a review sufficient to find that there are submissions of

both expert and witness evidence by both parties regarding the liability of the individual

Defendants Rocha and Diaz to conclude that the issue must be submitted to a trier of fact.  The

motion of the individual Defendants for summary judgment will therefore be denied.

### C.  Supervisory Liability

      Plaintiffs' TAC alleges claims for supervisory liability against Margaret Mims ("Mims"),

Sheriff of Fresno County, Tom Gattie ("Gattie"), Assistant Sheriff of Fresno County, and Rick

Hill ("Hill"), administrator of Detention Programs & Services Bureau for the County of Fresno.

The status of Defendants Gattie and Hill is not clear to the court at this time.  As will be

discussed *infra*, Defendants' UMF's allege that Mimms "was not involved in any decisions

regarding [Decedent's} or Cuevas's incarceration at the jail," and Plaintiff disputes the UMF by

alleging Mimms is/was responsible for the promulgation of constitutionally deficient policies

and procedures.  <u>See</u> Doc. # 109-1 at ¶154.  Thus, the status of Mims as a Defendant is clear.

      With regard to Gattie and Hill, Defendants proffer exactly the same UMF's but Plaintiffs

offer no objection to allegations that Gattie and Hill "were not involved . . ." <u>See</u> Doc. #'s 154 and 157.  Similarly, Plaintiff's opposition to Defendants' motion for summary judgment mentions Gattie and Hill in the heading for the portion of opposition that alleges supervisory liability based on a failure to train Diaz and Rocha to "make housing decisions based on psychiatric diagnoses."  Doc. # 109 at 35:9-10.  However, Gattie and Hill are not named in the text and, except as noted above, the court has found no reference to them in Plaintiffs' opposition.  The court will continue to refer to the "Supervisory Defendants" in the discussion that follows, but the court expects that the parties will clarify the allegations with regard to Gattie and Hill prior to trial.

In its memorandum opinion and order of July 30, 2015, the court set forth the standard for determination of liability of a supervisory defendant in his or her individual capacity as follows:

> We have found supervisorial liability under § 1983 where the supervisor "was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." <u>Lolli v. County of Orange</u>, 351 F.3d 410, 418 (9th Cir. 2003) (quoting <u>Jackson v. City of Bremerton</u>, 268 F.3d 646, 653 (9th Cir. 2001)). Thus, supervisors "can be held liable for: 1) their own culpable action or inaction in the training, supervision or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1292 (9th Cir. 2000).

<u>Edgerly v. City and County of San Francisco,</u> 599 F.3d 946, 961 (9th Cir. 2010).

Defendants allege a number of UMF's that together go to support the proposition that the individual Defendants Diaz and Rocha were not improperly selected or trained.  <u>See</u> Doc. # 109-1 at ¶¶ 32-58.  Plaintiffs do not argue that Diaz or Rocha were wrongly selected.  The court therefore concludes that any claim of supervisory or entity liability based on initial selection of Diaz or Rocha that may have been alleged in Plaintiffs' SAC has been abandoned.

What remains at issue with regard to Plaintiffs' supervisory are claims against Mims and the County for adoption and promulgation of policies that are themselves insufficient, even if enforced and followed, to prevent constitutional harm to detainees such as Decedent and for acquiescence to customs and practices that resulted Decedent's harm.  Also remaining are claims by Plaintiffs that Diaz and Rocha were not adequately trained or supervised.

The center of contention between the parties, as it relates to supervisory liability, is the extent to which existing policies relating to "classification" are sufficient, even if followed, to guide decisions that determine the housing of inmates in isolation or with one or more others.  It is Defendants' contention, expressed in a number of UMF's and backed by declarations and deposition testimony, that the policies instituted by Defendants' are sound, reflect relevant standards of care and are both implementable and implemented in real-life situations.  Plaintiffs' contend, on the other hand, that the existing policies cited by Defendants are deficient in that they address the broad categorization of inmates along such lines as level of offense, criminal history, previous incarceration experience and the like; but do not address the separate topic of compatibility of inmates with other inmates of the same category.

Plaintiffs contend, again backed by deposition testimony and expert opinion that the placement of inmates based solely on category and solely on the presence or absence of prior *demonstrated* incompatibility with a particular inmate is not sufficient to meet a constitutional standard of care.  Specifically, Plaintiffs contend, based on expert opinion, that Defendants' policies, procedures and practices were constitutionally deficient "when it came to determining where to actually house a mentally inmate and with whom [and] there were no policies, procedures, formal training or even management oversight" of the actual assignment of mentally ill inmates."  Doc. # 109 at 28:15-17.  Essentially, Plaintiffs contend that, absent an "keep separate" order based on *past* incompatibility, Defendants were free to place mentally impaired

inmates together "to see if it would work out" so long as both inmates were classified as having psychiatric issues.  Plaintiffs contend by way of expert opinion that such a policy and/or practice was constitutionally deficient.

With regard to claims relating to training and supervision, Plaintiffs allege in their DMF's proffer expert opinion that County and the Supervisory Defendants "failed to implement adequate training for classification officers," Doc. # 109-1 at ¶ 10, and that they were inadequately supervised.  See id. (no oversight on housing decisions) and at ¶ 24 (insufficient auditing of housing decisions).

Again, it is not the court's function to weigh contesting expert opinions or deposition testimony; it is simply to determine if the non-moving party has presented evidence sufficient to raise an issue of material fact.  The court is of the opinion that, with regard to the issue of supervisory liability, Plaintiffs have presented evidence sufficient to carry that burden. Defendants are therefore not entitled to summary judgment on the issue of supervisory liability.

### D.  Qualified Immunity

Defendants also contend that Defendants Mims, Diaz and Rocha (and, presumably Gattie and Hill) are entitled to qualified immunity.  The court has previously outlined the requirements for the defense of qualified immunity thus:

> The legal requirements for qualified immunity are well established. To determine whether qualified immunity applies, the threshold question is whether, in the light most favorable to the party asserting injury, the facts show an officer's conduct violated a constitutional right. Saucier [v. Katz, 533 U.S. 194, 201 (2001)]; Robinson v. Solano County, 278 F.3d 1007, 1012 (9th Cir. 2002) (en banc). If no constitutional right was violated, immunity attaches and the inquiry ends. Saucier, 533 U.S. at 201. If a constitutional right would have been violated were a plaintiff's allegations established, the next step is to ask whether the right was clearly established in light of the context of the case. Id. Finally, the contours of the right must be clear enough that a reasonable officer would understand whether this or her acts violate that right. Id. at 202.

Doc. # 94 at 11:7-17.

Defendants' claim to qualified immunity is based on the contention that facts are lacking to show that "every reasonable jail official would understand that Officer Rocha's decision to house [Decedent] and Cuevas was unconstitutional" because "there was no evidence that Cuevas posed a substantial risk of harm to any inmate, let alone [Decedent]."  Doc. # 104-1 at 30:8-11. Defendants' argument relies substantially on the distinction drawn in Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043 (9th Cir. 2002) ("Ford") between application of the two-step analysis required by Saucier in the context of an alleged violation of the Fourth Amendment, as was the case in Saucier, and in a case alleging an Eighth Amendment violation.

Prior to the Supreme Court's decision in Saucier, the Ninth Circuit had held that a finding of triable issues with regard to deliberate indifference precluded a finding of qualified immunity.  Ford 301 F.3d at 1045 (citing Hamiltion v. Endell, 981 F.2d 1062 (9th Cir. 1992)). The Ford court noted that in the case of the Fourth Amendment claim alleged in Saucier, the second prong of the analysis – whether a reasonable officer would know that the application of unreasonable force was a violation of a constitutional right – merged into first inquiry – whether there was a constitutional violation.  The Ford court observed that under the Fourth Amendment the result of the first inquiry determines the outcome of the last inquiry because the same standard – reasonability – is used in both cases.  See id. at 1048-1049.

The Ford court then examined the two-pronged Saucier analytical framework in the context of qualified immunity against an Eighth Amendment Claim.  The Ford court held that consideration the facts of that case, which involved the murder of an inmate by his cell-mate, in the light most favorable to the non-moving party would show a violation of the constitutional right established by Farmer thereby establishing the first prong of the Saucier analysis.  Id. at 1050.  In disapproving the holding in Hamilton, the Ford court held that under the analytical framework established by Saucier it is no longer valid to conclude that qualified immunity is

unavailable solely because the officer acted with deliberate indifference.  The court held instead that Saucier required a second fact-specific analysis to determine whether, under the particular facts of the case, it would be *apparent* to a *reasonable* officer that the course of conduct undertaken would pose a *substantial* risk (as opposed to simply a risk) of *serious* harm (as opposed to some harm).  See id. at 1050-1051.

The individual Defendants contend that they are entitled to qualified immunity under Ford because "[t]here was no evidence that Cuevas posed a substantial risk of harm to any inmate, let alone [Decedent.]"  Doc. # 104-1 at 30:10-11.  The court disagrees.  There are two factual differences that distinguish Ford from the case at bar.  First, the institution in Ford, the California Medical Facility – Vacaville, was populated mostly by inmates needing medical or psychiatric services.  The classifications at the Vacaville facility were undertaken by a committee that made a specific designation at the time of classification as to whether an inmate could be housed in a double cell or whether the inmate required isolation.  It appears to this court that the Vacaville facility's classification system was more inclusive of information concerning characteristics that showed whether an inmate was a predator or a victim.  Second, the officers in Ford had information at the time of co-housing that indicated the victim and his attacker had previously been successfully co-housed and that they had requested to be housed together.

As the court has noted, the parties have alleged contested facts to show that either or both Decedent and Cuevas were or were not dangerous, that co-housing them would or would not have created a serious risk of substantial harm and that the risk of harm was or was not obvious. The court must therefore conclude that Plaintiffs have alleged facts to show that there remains an issue of material facts as to whether a reasonable officer would have known that co-housing Cuevas and Decedent would have violated Decedent's Fourteenth Amendment right against harm by another inmate.  The court therefore finds that qualified immunity cannot be granted to

1   any Defendant at this time.

2          **D.  Entity Liability**

3          Plaintiffs' SAC alleges that County is co-liable with Mims, for the promulgation of

4   policies that are constitutionally deficient.   Because Plaintiffs have raised an issue of material

5   fact as to whether the policies adopted and promulgated by County are constitutionally deficient,

6   summary judgment must be denied on this ground as to County.  In addition, Plaintiffs' contend

7   that County is directly liable for Decedent's harm because it operated its Jail facility knowing

8   that the facility was inadequate to handle the volume of psychiatric inmates it was required to

9   handle and knowing that staffing and services for "psychiatric inmates" were so deficient as to

10  constitute substantial threat of harm to psychiatric detainees such as Decedent.  Plaintiffs'

11  opposition to Defendants' motion contends that Defendant Mims made public statements

12  recognizing the insufficiency of Jail facilities to house and treat inmates with psychiatric

13  disorders and that County allowed the Fresno County Jail to continue to function despite

14  knowledge that its ability to properly house and manage inmates with psychiatric problems was

15  constitutionally deficient due to both physical and personnel shortcomings.

16         The court has found that Plaintiffs have produced evidence in the form of expert opinion

17  that creates an issue of material fact as to whether policies and customary procedures relied upon

18  by jail staff were constitutionally deficient in and of themselves.  Since those policies and

19  procedures are promulgated through the authority of Defendant County of Fresno, it follows that

20  County is not entitled to summary judgment for the same reason supervisory personnel are not

21  entitled to summary judgment.

22         The court's review of Defendants' opposition leads to the conclusion that Defendants

23  have not directly addressed Plaintiffs' contention that the jail facilities themselves are

24  insufficient to provide a level of care to psychiatric inmates that meets Fourteenth Amendment

-20-

requirements.  Defendants' UMF# 147 states in conclusory terms that the pod in which Cuevas and Decedent were housed "was properly staffed."  This UMF is vigorously disputed by Plaintiffs' who rely on the deposition testimony of Jeffrey Duran to support the proposition that realignment had left the Fresno County Jail with insufficient isolation cells to meet the needs of an increasing number of inmates with psychiatric issues.  See Doc. # 109-1 at ¶ 147 (Plaintiffs' response).  Defendants' UMF # 148 proffers that the jail where Cuevas and Decedent were housed "was constructed in accordance with CCR Title 24."  While this fact is admitted, it is not particularly relevant to Plaintiffs' contention of inadequate facilities or staffing.

Essentially, Plaintiffs' opposition to Defendants' motion for summary judgment as to County presents evidence to support the contention that Decedent and Cuevas should have been housed in isolation cells but were not because isolation cells were chronically unavailable and that County was fully aware of both the need for and shortage of isolation cells.  Based on those facts, the court must find that Plaintiffs have proffered evidence sufficient to raise an issue of material fact as to the liability of County for maintaining constitutionally deficient facilities.

## II. Plaintiffs' State Law Claim for Wrongful Death

Defendants contend that County and the individual Defendants are immune from Plaintiffs' state law claims by operation of California Government Code sections 844.6, 845.2 and 820.2.  Plaintiffs assert that statutory exceptions apply to prevent immunization pursuant to section 844.6 and section 820.2 does not apply to the individual Defendants Rocha and Diaz. The court will consider immunity or lack of immunity to state law claims for County, the Supervisory Defendants and Rocha and Diaz in that order.

### A.  County of Fresno Immunity Under Subsection 844.6 and 845.2

Subsection 844.6 immunizes any "public entity" against state claims for injuries proximately caused by any prisoner."  Plaintiffs do not dispute that subsection 844.6 applies to

immunize County absent some statutory exception.  Plaintiffs contend that subsection 844.6(c) provides statutory exception to the immunity provided in subsection (a) because subsection (c) provides that immunity is not available where the injury is cause by "the dangerous condition of public property under Chapter 2 (commencing with Section 830) of this part."  Cal. Gov. Code § 844.6.  Plaintiffs' argument fails to apprehend all of the provisions of subsection (c).  In its entirety, subsection (c) provides: "*Except for injury to a prisoner*, nothing in this section prevents recovery from the public entity for an injury resulting from the dangerous condition of public property under Chapter 2 . . . ."  (italics added).  If there were any ambiguity to this "exception to the exception," such ambiguity is resolved by reference to subsection 845.2 which broadly provides immunity from liability for any public entity or public employee "for failure to provide a prison, jail or penal or correctional facility, or if such a facility is provided, for failure to provide sufficient equipment, personnel of facilities therein."  The court concludes the entity Defendant, County of Fresno, is immune from liability from Plaintiffs' claim for wrongful death.

### B.  Supervisory Employees are not Immune Where Sued in their Personal Capacities

Subsection 845.2 provides immunity for claims arising from deficiencies in "equipment, personnel or facilities."  Plaintiffs do not argue otherwise.  Correspondingly, Defendants do not contend that supervisory Defendants, where sued in their individual capacities, are not immune with respect to state claims arising from causes other than those covered under subsection 845.2.  Thus, there is no argument that, to the extent the Supervisory Defendants may be liable for deficiencies in policy content, training or supervision, the Supervisory Defendants are not immune under subsection 844.6 or any other statutory provision cited by Defendants.

### C.  Officers Diaz and Rocha are not Immune Pursuant to Subsection 820.2

California Government Code subsection 820.2 provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of

an exercise of discretion vested in him, whether or not such discretion was abused." Id. Defendants contend that Rocha and Diaz are immune pursuant to subsection 820.2 because the decisions to remove Decedent from isolation and the decision to co-house Decedent with Cuevas were exercises of discretion within the meaning of the statute. This court has addressed this issue previously in this case and has rejected the proposition that jail personnel are entitled to immunity under section 820.2. See Doc. 34 at pp. 22:17-24:11. Neither of the cases cited by Defendants; Thompson v. County of Alameda, 27 Cal.3d 741 (1980); or Goolsby v. Cate, 2012 WL 2088762 (2012), persuade this court to revisit its prior decision. Both Thompson and Goolsby involved decision to release or not release an incarcerated inmate. As the court's prior opinion pointed out, decisions to incarcerate or not incarcerate are discretionary. Once a decision is made to incarcerate, the receiving facility has the policy and constitutional duty to "to take reasonable steps to assure that a detainee does not suffer injury or death at the hands of another inmate." Doc. # 34 at 24:5-6. The court reasoned that subsection 820.2 does not apply to housing decisions because "once the decision was made that Decedent was to remain in custody pretrial, the considerations necessary to prevent harm to Decedent during the term of his pretrial detention were ministerial in nature, not discretionary." Id. at 24:6-9. This decision remains the law of this case.

**III.  Plaintiffs' Claim for Breach of Mandatory Duty is Deemed Abandoned**

Plaintiff's fifth claim for relief alleges breach of mandatory duty against County based on County's duty to provide prompt and adequate medical attention. As noted above, it is the court's understanding that all claims based on failure to provide adequate medical care have been withdrawn. The court presumes that Plaintiffs' fifth claim for relief is among the claims withdrawn. Plaintiffs do not argue otherwise.

**IV.  Punitive Damages Claim is Subject to Summary Judgment**

Defendants contend that Plaintiffs' claim for punitive damages is subject to summary judgement.  The court agrees.  Plaintiffs do not dispute that punitive damages may be awarded only on a finding of fraud, malice or oppression. Cal. Civ. Code § 3294(a).  The court agrees with Defendants that Plaintiffs have not proffered any DMF's to show the requisite state of mind of Defendants nor does Plaintiffs' SAC allege facts which, if proven, would show the necessary malicious or oppressive state of mind.  Summary judgment will therefore be granted as to Plaintiffs' claim for punitive damages.

THEREFORE, for the reasons set forth above it is hereby ORDERED that:

1.  Defendants' motion for summary judgment is GRANTED as to Plaintiffs' fifth claim for relief and as to Plaintiffs' claim for punitive damages.

2.  Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claim for wrongful death under California common law as to County of Fresno only.

3.  In all other respects, Defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated:   June 14, 2016   _____

SENIOR  DISTRICT  JUDGE

-24-